Filed 10/23/24  P. v. Mendoza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TOMAS TIRADO MENDOZA,<br><br>    Defendant and Appellant. | F085124<br>(Super. Ct. No. DF014553A)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REQUEST FOR PUBLICATION**<br>**[No Change in Judgment]** |

**THE COURT:**

It is hereby ordered that the opinion filed herein on October 14, 2024, be modified as follows:

1.      At the top of page 3, the sentence:  "Alternatively, we find that any incriminating statements made by Mendoza, including his apology letter to the victim, were made involuntarily"  is deleted in its entirety.

2.      In the first full sentence, on page 47, the word "to" is added between "and counsel" in the sentence beginning "This false promise …"  so the sentence now reads:

> This false promise of confidentiality was the antithesis of the *Miranda* warnings designed to protect the defendant's rights against self–incrimination and to counsel.

There is no change in the judgment.  Except for the modifications set forth, the opinion previously filed remains unchanged.

The request for publication of the opinion filed on October 16, 2024, is hereby denied.  The opinion does not establish a new rule of law, nor does it meet any of the other criteria set forth in rule 8.1105(c) of the California Rules of Court.

In compliance with rule 8.1120(b) of the California Rules of Court, the Clerk/Executive Officer of this court shall transmit copies of the request for publication, the opinion, and this order to the Supreme Court.

FRANSON, J.

WE CONCUR:

DETJEN, Acting P. J.

PEÑA, J.

Filed 10/14/24  P, v. Mendoza CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TOMAS TIRADO MENDOZA,<br><br>    Defendant and Appellant. | F085124<br><br>(Super. Ct. No. DF014553A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell and Kimberley A. Donohue, Assistant Attorneys General, Rachelle A. Newcomb and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Tomas Tirado Mendoza was convicted in September 2022 by a jury of molesting his 14 year old stepdaughter, N.C., by continuous sexual abuse of a child under the age of

14 (Pen. Code, § 288.5, subd. (a); count one);[1] committing a lewd and lascivious act on a child under age 14 (§ 288, subd. (a), count two); and oral copulation or sexual penetration of a child 10 years old or younger (§ 288.7, subd. (b), count three). The jury also found true enhancement allegations on each count that the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)) and that Mendoza violated a position of trust (Cal. Rules of Court, rule 4.421(a)(11)).

Mendoza was sentenced to an indeterminate term of 15 years to life on count three and the midterm of six years on count two, to be served consecutively. The court stayed Mendoza's sentence of 12 years on count one. Mendoza was ordered to pay fines and fees not at issue on appeal and to register as a sex offender pursuant to section 290.

Mendoza was questioned at a sheriff's substation without receiving any warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The trial court denied Mendoza's motion to suppress incriminatory statements and an apology letter written to the victim at the conclusion of questioning. The court found Mendoza was not in custody and, therefore, the officer did not need to give *Miranda* advisements. The court further found Mendoza voluntarily made the incriminatory statements and wrote the apology letter.

During questioning, the deputy falsely promised Mendoza that everything he said would be confidential, elaborating: "I'm not going to tell your wife. I'm not going to tell some lady out there; the judge, nobody. It just stays with you and me." As we explain, Mendoza's initial encounter and conversation with Deputy Garza appeared to be voluntary and Mendoza was not initially under arrest. But as questioning grew more intense, however, a reasonable person in Mendoza's position would not have felt free to leave the interview and would have felt he or she was in custody undergoing an

---

[1]     Unless otherwise specified, all statutory references are to the Penal Code.

interrogation.[2]  Under these circumstances, the deputy was obligated to advise the defendant of his *Miranda* rights.  It was therefore error for the trial court to deny Mendoza's motion to suppress his statements to Garza and his apology letter to the victim.[3]  Alternatively, we find that any incriminating statements made by Mendoza, including his apology letter to the victim, were made involuntarily.  The error was prejudicial.  The judgment is reversed, and the case remanded for a new trial.

I.     THE INTERVIEW

   A. *Background Facts*

As we explain in greater detail below, Mendoza and C.M., N.C.'s mother, had lived together for 10 years and had three children together. Mother had three children from a previous relationship, including N.C.. On June 29, 2019, 14-year-old N.C. sent her mother a text message stating that Mendoza was molesting her.  C.M. reported the incident shortly thereafter, and the Kern County Sheriff's Office began its investigation on July 5, 2019.  Mother and the children moved to Los Angeles on July 4 and mother forbade Mendoza from contacting the children, including N.C.  Senior Deputy Phillip Garza first contacted Mendoza by phone, saying he wanted to speak to him and asked if he could come to the Delano substation to talk.  Mendoza came to Delano substation on August 1, 2019, where Deputy Garza questioned Mendoza for two hours in Spanish in his office.

---

[2]     In our presentation of the facts, and later in our legal analysis, we use the terms interview and questioning interchangeably.  We also use these two terms in our legal analysis until it becomes clear that Garza's questioning of Mendoza became a custodial interrogation.

[3]     The parties originally briefed only whether Mendoza's inculpatory statements were made voluntarily.  The parties have filed supplemental briefing on whether Mendoza was in custody during questioning and whether *Miranda* was violated.  They have also filed supplemental briefing on whether Mendoza is procedurally barred on appeal from challenging his statements as being involuntarily made.

### B.  *Preliminary Questioning*

The interview began with exchanging first names.  Garza directed Mendoza to his office, which was cooler, rather than the interview room.  Garza noted the interview room was hot and it was "where we put the suspects, not you."  Garza asked Mendoza to leave the door open.[4]  Garza told Mendoza he was not under arrest, asked if Mendoza understood him, and added that "you're not in trouble."  Garza reiterated that the door was open, Mendoza was not a suspect, he could walk out when he wanted to, and he was "not here by force."  Garza added that Mendoza was not handcuffed, and Mendoza was there voluntarily.  Garza thanked Mendoza for his cooperation.

Mendoza mentioned he had come looking for Garza a week earlier.  Garza explained he was away, just returned the day before, and that he was notified Mendoza tried to contact him.  Garza told Mendoza: "I wanted to talk to you as soon as possible to get this done.  [¶] … [¶]  To go back to normal life.  I know it is very difficult."  Garza asked Mendoza for his identification and the ages of the children living at home.  Garza asked other preliminary questions about the addresses the family had lived and how long he had been with his wife.  Later in the interview, Mendoza explained that he was a supervisor of people working fields of grapes.  His position was higher than a crew foreman.  Mendoza said he was in charge of groups of foremen.

Mendoza said he was thinking of cooperating because he knew he had not done "bad."  Garza explained: "Allegations are true and many times are not.  I already have my thoughts, and that's why we're talking like this, and not like in the other rooms, not like the other ones who are guilty of something.  Do you understand me?"  Mendoza replied, "Yes.  Yes, I understand."  Garza added, "It's quite different over there."

---

**4**　　Feigning difficulty with Spanish, Garza asked Mendoza whether he had the conjugation correct for the word "open."

Garza elaborated on his comments that he thought Mendoza had done nothing wrong. "I don't think you've done anything wrong. Just so that you know where I'm coming from. I don't believe you've done anything wrong. But I have to do the investigation and do it right, and have to come to a conclusion. [¶] … [¶] … Conclude it, just to talk to you."

Garza asked Mendoza to say why he was there. Mendoza explained it was because his stepdaughter, N.C., told her mother that Mendoza went into her bedroom and touched her parts. When his wife told him about it, Mendoza was at work and went home to talk to N.C. to clarify the problem. Mendoza was worried the allegation would get him in trouble, but N.C. did not want to talk and stayed away from him. After four days, N.C. left home and Mendoza had not talked to her since then. Mendoza sent a text to N.C. who replied that they had filed a report and that he would be investigated.

Mendoza said there was no problem in investigating him. He would cooperate because he wanted "to get all this fixed." Mendoza explained that his wife did not want to listen to him. Mendoza understood the allegation to be that he went into N.C.'s bedroom and touched her. The week before, N.C. said somebody went up with her, she was screaming, but she lost her voice.

Mendoza told Garza that N.C. had psychological issues and was seeing a school psychologist. N.C. had cut her own hair while taking a shower. Mendoza told his wife N.C. needed help with a psychologist but the wife did not listen to him. There were apparently times N.C. tried to take her own life. The psychologist told N.C.'s mother they should be more careful with N.C. and pay more attention to her.

C. *Garza's Questioning Becomes More Confrontational*

Garza asked about the reasons for N.C.'s psychological issues. Mendoza explained that after getting help from the school psychologist, N.C. began to behave more normally. Before, if anyone said something to N.C., she would turn around and not answer. Garza said he found it strange that a girl like N.C. would come up with these

5.

things out of nothing. Garza asked Mendoza what had happened at home and why all of the sudden did N.C. say Mendoza was doing this. Garza suggested that children and adults see and interpret things differently.

Mendoza explained that N.C. called him and told him her mother wanted to send her to Mexico, but she wanted to come back home to live together as a family. N.C. asked Mendoza to apologize for what he had done. Mendoza asked N.C. why he would apologize for something he did not do. Mendoza said he told N.C. it would be better to discuss this with her mother and hung up.

Garza told Mendoza that N.C. said Mendoza had touched her. Mendoza asked where, outside or inside the house? Garza replied that N.C. reported the touching occurred inside the house in her room. Garza asked Mendoza if he had gone inside N.C.'s room. Mendoza said he had, but only with his wife present to turn off N.C.'s television.

Garza told Mendoza he had a child with his wife and stepchildren and knew it was difficult. Garza challenged Mendoza's claim that he never went into N.C.'s room after living in the same house for seven years. Mendoza maintained that he only went into N.C.'s room when his wife was there, not when N.C. was by herself.

Garza asked Mendoza if he knew when the allegations started. Mendoza said on June 29th and that everyone left the home on July 4th. Garza reassured Mendoza saying: "I've spoken with your wife and the kids. I think everything is going to be okay, with time; I think there's a chance. But to get it all good, all we need is the truth about everything. On any investigation. This and all. The truth about everything. My job is just to investigate, and to see what the truth is. Sometimes the truth is like you and I might see something, and a child might see something and the truth is they are different things. Because we see and interpret things differently."

Garza questioned what had happened in Mendoza's house that N.C. interpreted in a bad way. Mendoza said N.C. may have misinterpreted his intentions because he and his

wife were trying to get closer to N.C. at the psychologist's suggestion. Mendoza said he forcibly tried to hug N.C. and he thought this was what N.C. misinterpreted. Garza asked how Mendoza felt about his stepdaughter. Mendoza said he loved her the same as his own kids. He kissed his daughter on the cheek, the lips, and her head but could not do this with N.C. Replying to a question from Garza, Mendoza said he had kissed N.C. on the cheek and the forehead in front of her mom, never on the lips.

Garza asked if Mendoza kissed N.C. goodnight. Mendoza said he would only say goodnight to N.C. because N.C would not allow him to kiss her and will not let him talk to her. She would not allow Mendoza to fix her blanket. Once when his wife was making tortillas, N.C. was passing by when Mendoza hugged her, she yelled to her mother that Mendoza was abusing her. Mendoza and his wife told N.C. to be careful with those words because they could be taken as an accusation.

When Garza asked Mendoza if he went inside N.C.'s bedroom to say goodnight and fix her blanket, Garza said he only opened the top door, almost never went into the room when N.C. was by herself, and either way his wife was nearby.[5] Mendoza placed a lock on N.C.'s bedroom door so there would not be any more problems. Garza confronted Mendoza: "There is something going on, for these allegations [to] exist." Garza added: "I don't think a child would come up with this, like that in one day. Something is happening, or was happening." Mendoza responded that N.C. may have "misinterpreted the actions one does sometimes" because his wife was always there.

Garza asked Mendoza to tell him about going with N.C. in his truck to get a flavored icy. Mendoza said they got the icy drinks and went back home. Mendoza added N.C. was saying that he took her into a field and tried to touch her. They lived in the fields so they passed by them and stopped in front of the house to eat their icy drinks. Garza asked Mendoza how he drove and what happened inside the truck. Garza recalled

---

[5]     Mendoza explained that N.C.'s room had a top and bottom door.

that his own grandfather would affectionately have his hand on Garza's head, shoulder, or leg.  He also asked what N.C. could have misinterpreted and whether Mendoza drove with N.C. "affectionately."  Mendoza said he always drove with both hands on the steering wheel unless he needed to grab drinking water or a soda.

Garza pressed Mendoza about how many times he drove with his left hand on the steering wheel and his "right hand there on her shoulder, head, what do you call it?  The leg right here, like a dad who loves [his] daughter?"  Mendoza denied doing anything with his right hand except to grab his drink.  Garza pressed the point.  Mendoza said he always used both of his hands while driving.

Garza said he had spoken to N.C., and she "tells me a lot of things."  Mendoza replied that N.C.'s mom believes her, but he did not understand why N.C. was saying the things she was saying.  Garza asked Mendoza if he drank.  He then suggested that drunk or not, things sometimes happen and: "[N.C.] has told me very different stories from what you're telling me.  But very similar also."

Garza continued:  "At the end of all, we just want the truth, and like I am explaining to you, things happen.  I know people are scared."  Mendoza replied: "No.  Afraid."  "Afraid, like um.  If you touch a child, you're going to go to jail."  Garza added "And I tell people, there are times that yes.  But there are also times that no."  Garza explained men talk and lie to him, denying allegations.  "And then we do the investigations, we get the evidence, we get the DNA evidence, we get the biological evidence, other proof, witnesses, videos, anything.  There are many ways to — " Mendoza finished Garza's sentence with there are, "Many ways to pull the truth out."

Garza told Mendoza that he had presented the evidence and thanked Mendoza for telling him the truth.  "And do you know what I tell them?  You're not going to jail yet.  Do you know why?  Because there are times that a man touches a child, but he had good intentions, and children misinterpreted it."  Mendoza agreed.

8.

Garza used himself as an example. Going into his daughter's room, grabbing a blanket to cover her better, she moves, and his hand touches a part where it should not. Garza asked whether this would be his fault. Mendoza said it would not if Garza's intentions were not bad. Garza replied, "Exactly." Garza added that if the girl wakes up and sees his hand, she would think badly when his intention is just to cover her.

Garza added, "Accidents happen." "So it is possible that a man touches a girl like that, but it is not illegal. Because the intentions are not there." Mendoza echoed it was all "about the intentions one has." Garza replied: "Yes. Exactly… I'm speaking with you, and I'm speaking with you in a different way from the other suspects." Garza suggested Mendoza's conduct was not criminal. "Because with you I do know what things have happened, but I don't think they are criminal. I want you to think about that; okay?"

Garza encouraged Mendoza to continue talking. "But I do think that things have happened. I just want—I'm going to tell you. I only want the truth. What has happened. Where have you touched her? Why? What were the circumstances your hand was there near her part. Just to … to document it."

Mendoza mentioned a time when the TV controller was under N.C. with the television on and he pulled the controller out. Mendoza was not sure if he touched N.C.'s part because she woke up and asked him what he was doing. N.C. was angry with Mendoza. This happened in her bedroom. This incident happened three weeks or a month earlier. Mendoza said he only went in N.C.'s room to turn off her television. He went in the room during the day if he needed something but his wife would be there.

Mendoza said he asked his wife why N.C. had so much anger toward him. His wife told him it was because he sometimes looked at N.C. like a woman, not like his daughter. Mendoza said he knew N.C. was a young woman, but he loved her in the same way as his children. Garza and Mendoza talked about teenage boys and girls going through hormonal changes.

9.

Garza told Mendoza not to be afraid. Mendoza replied he was worried because it was not a small problem. Garza assured Mendoza that there were instances, "[s]ometimes things happen that, circumstances where a man touches a woman and it is not criminal. Okay? And in the wrong places." As an example, Garza mentioned checking his five-year-old child's front part for a rash. Garza asked if he had committed a crime. Mendoza replied, "No, because you're helping." Garza said, "Exactly, My intentions are not criminal." When Mendoza used the example of changing a diaper, Garza explained changing it was not a crime.

After more discourse about changing children's diapers, Garza veered the conversation back to N.C., suggesting Mendoza touched N.C. "I do think there have been instances where you touch her. I want to tell you that when a man touches a girl, whether on the skin or the clothing, you leave biologic evidence. You leave DNA evidence." "It gets left on the clothes and in those specific parts. Do you understand?" Mendoza said, "Yes."

Garza said: "What I'm asking here—and just tell me your own way—I just want the truth. Okay?" "What has happened, that you've touched [N.C.] on those parts? And if it was an accident—." Mendoza replied, "I don't know." Garza asked Mendoza to just tell him if it was on purpose, if he was not drunk, if he was in depression, if he thought it was his other daughter.

Mendoza responded: "No, no. Not that." Garza asked Mendoza if he was a man in heat, like he just wanted sex. Garza said he was not sure of the word in Spanish. Mendoza said: "Yes. But I do understand. No, what happens, maybe if I have touched her in parts like that, I have never done it, in other words, wanting to touch her."

A lengthy discussion followed about a time N.C. let herself fall to the floor a few days before because Mendoza hugged or attempted to hug her. Mendoza said he stuck his hand out so she would not fall and he "did touch her like that, but it's not that I wanted to do it." Mendoza said he touched N.C. in the middle on her vagina. This

happened at the entrance to N.C.'s bedroom in the hallway as Mendoza was passing by, close to the open door.  His other daughter was standing next to her bed.  When Garza asked him if anything else happened, Mendoza said "[n]othing."

The conversation turned to custody issues concerning whether Mendoza would get to see his children.  Garza told Mendoza he could see his kids and that a relative cannot hide them.  Garza said he believed a man had a right to go on vacation with his kids.  Garza suggested Mendoza work together with his wife.  Mendoza replied when he spoke to his wife, "she told me that you guys said I cannot see them."  Garza said he thought "[m]aybe she misinterpreted something."  Garza said he would speak to Mendoza's wife because Mendoza had a right to see his kids and there was no restraining order.  Garza reiterated he would speak to Mendoza's wife.

Garza checked to see if the front secretary had left because "I'm going to speak some things I have to—nobody should hear this."  Garza explained that he had spoken with N.C., mentioning their prior comments about "the age of the hormones."  Garza added:  "So she tells me that sometimes she lets you touch her.  She lets you."  "Just hear me out.  That it's her fault.  And when that happens, then an adult, like a man—she looks almost like an adult.  You know what I mean?  That she is well, what's the word?  She is well—"  Mendoza finished Garza's sentencing saying, "Formed."

Garza suggested that a man is going to falter and "what's the word?"  "Let me think.  Where's the dictionary?  Consen[s]ual.  Do you understand?  Consen[s]ual.  And if it is consen[s]ual, you know, when it's something consen[s]ual, like a consen[s]ual couple."  Mendoza used the word aware.  Garza replied:  "Aware.  When you've given permission."  Like when a man has sexual relations with a spouse.  Garza asked if Mendoza was having consensual sex.  Mendoza appeared to ask Garza if Garza meant having sex consciously.  Garza and Mendoza repeated the word "[c]onsciously" after one another.  Garza said many people think it is wrong, and although he had his own thoughts, he does not use them.

D. *Garza's Confidentiality Promise and Mendoza's Confession*

Garza began his promise of confidentiality with a short speech:

"I work in law; I make decisions from this book; California Penal Code. I work in what this book, Penal Code, tells me. What is legal and what is not legal. And there's a very fine line; this is legal and this is not legal. Here, you go to jail, go to jail, what you do, you know? A, B, C.

"But there there are circumstances in which you do not go to jail."

Mendoza said, or asked: "There are clauses." Garza continued with his first promise of confidentiality:

"Clauses. And in all that's happened, you and [N.C.], I do think that things have happened, but I don't think they are criminal. But I just want the truth. I want you to understand that everything you tell me is confidential. Is that how you say it?"

Mendoza briefly replied: "Yes. Confidential." Garza elaborated his promise of confidentiality a second time:

"Confidential. I'm not going to tell your wife. I'm not going to tell some lady out there; the judge, nobody. It just stays with you and me. Because it is me, who makes the decisions, or better, I'm the one who makes the conclusions if an act is criminal or not criminal. And the rules and conclusions that I make, are here in the Penal Code.

Mendoza said: "Yes. That is to say the book." Garza replied:

"Yes. In the book. To make the conclusions better, I need the truth. Okay? I am here because I am not talking to you like another suspect in another room; you're not cuffed, and you do not have to tell me anything. Do you understand me?"

Garza noted that Mendoza was cooperating and thanked him, adding that he needed the truth "because there are DNA biological evidence and all that." Garza continued: "[t]o make preferable conclusions, best ones, most clear that I have to make, I need the truth. Because if you tell me one thing, and it's contrary to the evidence—" After Mendoza replied affirmatively, Garza said, "What do you think that I am going to

12.

be thinking about you." Mendoza said that they were lies. Garza added: "Yes. Sometimes the truth is very hard. Sometimes the truth is—we're embarrassed."

Garza confided to Mendoza that he had made mistakes in life and was thankful they were not criminal. But, he had regrets and things he did not want to remember. Mendoza said there were things he did not want to remember. Garza agreed, adding: "So like you and [N.C.]; I need the truth. If they are [u]; if they're wrong, it doesn't matter. I just want the truth. [¶] To make my conclusions." At first, Mendoza said he never touched N.C. without clothes.

Initially, Mendoza only reiterated his accidental touching of N.C. He added that he talked to N.C. about her period, trying to explain to her what was going to happen. Mendoza thought N.C. thought the wrong thing and "it all piled up." Garza went over the falling incident where Mendoza said he accidentally touched N.C. on the vagina. Garza asked if there was evidence Mendoza touched the area of N.C.'s vagina, what would happen if Garza had more than one part of N.C.'s clothing and there was more than one time Mendoza touched N.C. there. Mendoza replied he only hugged N.C.

Garza asked Mendoza if he hugged someone how was his hand by N.C.'s vagina? Garza asked about Mendoza going into N.C.'s room at night and anything conscious was happening with Mendoza and N.C. Garza said: "Conscious. Just tell me that. Tell me the truth." Garza added that he needed to know the truth, "[i]f it happened once, I need to know. If it happened twice." Mendoza replied: "It did happen once." Mendoza admitted going into N.C.'s room while her blanket was off. She was wearing clothing, but he touched her and "put my hands there" on her "part."

Mendoza still called it an accident. Garza said he just needed the truth, thanked Mendoza for telling him, and told Mendoza there was no one else there but them. Garza asked Mendoza what he was thinking at that moment. Mendoza said he was not thinking anything, that it all happened "really quickly." Garza suggested Mendoza was in heat, like animals, or that he was aroused. Garza asked if Mendoza was in heat, like animals

13.

can be, and wanted sex. Observing that N.C. was a well-formed woman and not a little girl, Garza asked Mendoza if he had sexual thoughts about her. Mendoza said he did not have sexual thoughts.

Garza asked about the time N.C. told him that Mendoza touched her knee. Garza asked if Mendoza had a moment of fantasy. Mendoza responded, "Maybe." Garza said sometimes it happens and he only wanted the truth; he did not want to put words in Mendoza's mouth. Garza asked Mendoza what he was feeling at the moment. He replied, "I just felt the need to touch." "Nothing more." Garza asked, "Touch her in what way?" Mendoza said just to grab her, although not in a sexual way.

Mendoza said he did not stay there because, in the moment when he touched N.C., he reacted thinking, "oh shit, what am I doing?" Mendoza added, "She's like my daughter." Garza said, "We're men." Mendoza replied it was like Garza said, "it's a moment of weakness, like that." Garza asked Mendoza to explain about "how" and "what" weakness. Mendoza explained, "it's a weakness like something … sexual." When Garza suggested it was not penetration, Mendoza replied, it was "[l]ike caressing." Garza suggested: "I have a word; let's see: Arousal?" Mendoza said: "Exactly. Exactly, arousal."

Garza asked Mendoza to tell him the truth about how many times he touched N.C. Mendoza said it happened twice. The last time it happened was the night before N.C. told her mom. When asked how he touched her, Mendoza explained that he placed his hand inside N.C.'s leg for 30 seconds and demonstrated to Garza how he did so.

Garza asked if this was the first time Mendoza did this, was it twice, or was it three or four? Garza suggested there was a time before that. Mendoza replied it was two months before. Mendoza said that incident was an accident. Then Mendoza said there were three times before that he touched N.C.'s vagina over her clothes, but one time was an accident. When Garza asked if he did this purposely for sexual arousal, Mendoza

14.

admitted doing it, not so much on purpose, but he did do it. Garza asked if it was a moment of weakness and for sexual arousal. Mendoza replied, "Yes."

When asked if he tried to put his hand inside N.C.'s pants, Mendoza denied placing his finger inside of N.C.'s pants, explaining that his finger may have gotten stuck when he pulled the blanket off N.C. Mendoza touched N.C.'s foot and her pants twice when her shorts were up a little bit. Mendoza said nothing else happened and he put a lock on the back of N.C.'s door so he would not be able to open it.

Garza told Mendoza that N.C. reported there was a time years ago, when she was in fourth or fifth grade and sleeping in the living room, and Mendoza "came in and did that." Mendoza replied, "No. Maybe." Garza said it had happened and he just wanted to mention it. Mendoza said he went to pick N.C. up into his arms and she began "to move really crazy, and she was going to fall off my arms, so I put her back on the sofa." N.C. screamed at him and when she moved, his "hand touched her there." But this was because N.C. "started to move like crazy." When asked if this was another moment of sexual arousal, Mendoza said it was not because he was trying to take N.C. to bed. Mendoza said any touching was accidental.

Garza asked again about the incident when Mendoza and N.C. had icy drinks. Garza told Mendoza that he needed the truth and wanted to know if Mendoza touched N.C. again. Mendoza denied trying to touch N.C. at that time. Garza asked Mendoza about the day N.C. reported being molested. Mendoza said he pulled N.C.'s toe "and she got ugly, telling me things." They talked about money for getting a pizza later. N.C. said that because Mendoza pulled her toe, "she told her mom that I tried to touch her too."

Garza asked: "So, the day before she told her mom, and then one time two months before that; isn't there another instance where you touched her by sexual arousal, just really fast?" Mendoza replied: "Yes, just really fast." Garza inquired about a third time because he wanted to know if there were other times during the years. Mendoza said: "No. No, no." Garza responded, "I just need for documenting." Garza added: "So, only

15.

two times?" Mendoza said: "Two times were almost like intentional. Right? And two times that were accidents." Garza asked: "So, four times?" Mendoza replied: "Four times." Those were the only four times Mendoza remembered.

When asked if he had spoken to N.C., Mendoza said he had not. Mendoza said that when he touched N.C. she had been sleeping, woke up, he covered her again and left. Garza asked Mendoza about the times he touched N.C. for arousal and wanted to know if he also touched her breasts. Mendoza replied maybe so one time, but it was not intentional because he was trying to cover her. He added, however, that N.C. was sometimes uncovered and "maybe I did touch her breasts."

Mendoza said that when he tried to hug N.C., she would turn "in a crazy way; that's when her breasts were—" N.C. would fall down, Mendoza would forcibly hug her, and in so doing he would sometimes touch her. These "accidents" "happened many times on the breasts." N.C.'s mother knew about this because she had seen these falls happen many times.

Garza asked if there were other instances they had not discussed when Mendoza touched N.C.'s private part in a moment of sexual arousal or by accident. When Mendoza replied negatively Garza asked him if he was sure. Garza asked Mendoza if he had too much to drink the times he touched N.C. Mendoza said he was sober. Garza wanted to know if there was a time Mendoza showed N.C. his penis, quickly by accident in a moment of arousal. Mendoza replied there was a time N.C. came into the bathroom while he was taking a shower, but it was an accident because he thought it was his wife.

Mendoza described N.C. as never accepting a kiss on the cheek. N.C. would get defensive and they were always fighting. Once, his lips touched her just a little bit on her lips. N.C. told Mendoza to not kiss her there. He explained there were "always problems with that girl." Garza asked if there were any times N.C. tried to show Mendoza her breasts or private parts. Mendoza replied: "No. She's very careful with that." Garza

asked if there were times N.C. wanted Mendoza to touch her. Mendoza said he did not know but "she never demonstrated nothing like that."

When Garza asked if Mendoza had permission to touch N.C. twice out of arousal, Mendoza said it was not that he had permission. Garza suggested Mendoza "just faltered." Mendoza replied, "Yes." Garza asked Mendoza about the two times he touched N.C. for arousal whether it was "[w]eakness time." Mendoza said, "Yes." Garza asked whether Mendoza's penis was erect. Mendoza said no, it was "only in thought." Garza, continuing to probe, suggested Mendoza only wanted to touch N.C. Mendoza agreed, saying he only wanted to touch N.C.'s body. It never crossed his mind, and he did not want to have sex with her.

### E. *Apology Letter*

Toward the end of questioning, Garza asked Mendoza what he could: "do for her [N.C.] to make her feel safe and continue to live her life with you? Because she's a little bit scared this is going to happen other times. What can you do so this doesn't happen anymore?" Mendoza said the only thing he could do is to live separate from his family because "neither her, my wife nor I are going to be okay." Mendoza said there would be no trust between themselves, although he would like for his family to come back to live with him.

Garza reiterated that N.C. was afraid. Garza feigned ignorance of how to say apology in Spanish and asked Mendoza if he could tell him. Garza suggested in English that Mendoza apologize. Mendoza offered the Spanish word "disculpa", translated as "apology." Garza continued: "Yeah, A letter of, if you want to, so that she feels better. What do you think about that? Tell me." Mendoza replied: "For me, if she feels better, that's fine. If that helps her, I can make the letter." When Garza asked if he would do it, Mendoza said "Yes."

Garza handed Mendoza paper, offered to stand outside, and told Mendoza to tell him when he was finished. Garza said the date and told Mendoza to sign the apology.

17.

Garza told Mendoza that when they do these letters, "you do it your way." He also asked Mendoza if he needed water and gave him a cup of hot water. Mendoza wrote the following note:

> "[N.C.], I spoke with the sheriff officer about what happened, with the problem we're going through [N.C.], I just want you to know that I feel very bad about what happened, and please; I offer you an apology dear and don't be afraid I hope as you receive and read this letter you feel better"

Garza said he was going to give the note to N.C. He asked Mendoza if that was all he had to say, and do you not want to add anything else? He shared his own thoughts with Mendoza. Garza used the example of a spouse who cheats and later says he is sorry:

> "Well, what has he done? Sorry about what? What did you do, asshole? You know? The woman wants to know; sorry I cheated on you; sorry I slept with another woman; sorry I bought my lover a one thousand dollar diamond and I only bought you a flower. Do you understand me: She wants to know the apology for specifically for what?"

Garza told Mendoza to write down what he wanted. He was only giving Mendoza ideas. Garza added: "write what you want. I'm going outside. Tell me when you're ready." Mendoza asked to use the bathroom and Garza directed him where to go. Mendoza suggested N.C. would understand [Garza] better. Garza replied: "No, no, no. The letter is in your way, not mine." Mendoza added the following to his apology note: "and forgive me for having touched you where I shouldn't have it was just weakness Respectfully Tomas Tirado I hope you understand."

As the questioning was about to conclude, Mendoza asked if all was fine and whether he could see his kids. Garza indicated that was between them. Mendoza explained his wife had told him that if he spoke with Garza, "she was going to give me a chance to—" Garza apparently broke off Mendoza's statement and said he would talk to Mendoza's wife and then the two could communicate. Garza said: "I am going to call her today. So that things are over quicker." Garza added, "So that everything goes back to normal."

18.

Garza told Mendoza that it was almost over, but "[n]ot with us." Garza asked Mendoza if he had any questions. Mendoza asked if this problem was going to affect his record. Garza replied it was because, like he explained at the beginning, he was going to document everything. Garza explained: "When we began to talk, you told me a lot of things, that you touched her parts, accidents. There are instances, circumstances, when a man touches a woman in a private part and it is not criminal."

### F. *The Arrest*

Garza further explained that Mendoza told him he touched N.C.'s parts by accident "X amount of times." Garza understood this was not criminal but said: "you also explained to me, you told me the truth, and thank you. But there are two times that you touched her in a moment of weakness, for 10 seconds and 30 seconds. Those two instances are not accidents." Garza explained they were criminal felonies.

Garza then said, "I am going to arrest you." Mendoza asked, "[n]ow?" Garza said yes, asked if Mendoza wanted him to call someone, and said he was not going to tell anyone about Mendoza's charges but if he wanted to tell anyone he could do so. Garza told Mendoza that just because he was being arrested did not mean Mendoza was guilty, only that he had probable cause Mendoza had committed crimes.

Garza reiterated that he was arresting Mendoza, that he had a right to an attorney and to go to court, and there was a chance he could be free from that. Mendoza asked how long he would be under arrest and they discussed bail. Garza told Mendoza he legally could get three phone calls, but Garza would allow as many as he wanted.

## II.     PRETRIAL HEARING

A pretrial motion pursuant to Evidence Code section 402 to suppress Mendoza's statements was conducted on August 31, 2022. The parties stipulated that the transcription was "appropriate" and it "would go back to the jury." Defense counsel moved "to exclude the entire interview." The court noted it wanted to initially focus on the beginning and setting of the interview. Deputy Sheriff Garza was called as a witness.

Garza testified he was a sheriff's deputy for Kern County for about 20 years and he interviewed Mendoza. Garza initially contacted Mendoza by phone, spoke to him in Spanish, and indicated he wanted to meet with Mendoza. They later met at the Delano substation where Garza spoke to Mendoza in Spanish. Their conversation took place at 5:00 p.m. on August 1, 2019. Garza did not interview Mendoza in the suspect interview room but in his own office. Garza felt his office was a lot cooler, more comfortable, more relaxed, and would make Mendoza less nervous. Garza's office was 10 feet by 10 feet. His desk was in the middle of the office. Mendoza sat at a chair to the side of Garza's desk about two feet from the entry door to the office. The sheriff's substation shared offices with "Kern County health, and … Probation."

The door to Garza's office was open during the interview. Beyond Garza's office door was a larger squad room with six desks, each with a computer, where deputies prepare their reports. There were no other deputies present when Garza interviewed Mendoza. The audio recording of the interview was played during the hearing. The parties agreed to rely on the translated transcript of the interview before the entire recording was played.

Before making its final ruling, the trial court identified these issues: "first is whether this is a custodial setting and whether the conversation was freely and voluntarily given. And the second part is whether there's a foundation for the letter." The court regarded the first issue, which comprises two separate issues, as falling within *Miranda*. The court gave its preliminary thoughts before making a final ruling.

The court noted that Mendoza went to the substation by invitation and was not brought there. He was not in handcuffs and was not told he was under arrest. Garza's office door was left open. No one was blocking the door, Garza's voice was not intimidating, there was no yelling. The court found that when Mendoza arrived, he was not in a custodial environment and a reasonable person would believe they were free to

leave.  In addition to not being handcuffed, there were no other deputies around, including outside the door.

The court acknowledged that Garza used ruses, although it found his questions were open ended.  One ruse the court noted was Garza's mention of DNA evidence, but it was not phrased that "there will be DNA evidence."  The court also acknowledged that Garza used the word confidential and that Garza said:  "I'm not going to tell your wife. I'm not going to tell some lady out there, the judge, nobody."  The court noted Garza said he would make the decision about whether Mendoza's conduct was or was not criminal and there was discussion about the Penal Code.  The court found the letter admissible but subject to cross–examination.

The court found the interview to be consensual because "[a]t no time was the defendant not free to leave."  This was so even though there were ruses used.  The court again pointed out that Garza said he would not "tell anybody, including a judge."  The court reasoned that, although the statement may not have been true, perhaps no charges would have been filed if Mendoza had not been arrested based on the conversation.  The court ruled everything admissible and that there was no duty to give Mendoza *Miranda* warnings.  The court adopted its preliminary ruling as its final ruling.

The court's express reasoning included the issues of whether Mendoza was in custody, as well as if his statements to Garza were made voluntarily.  Although the court referred to Garza's promise of confidentiality as one of his ruses, it is clear the court did not find that the promise of confidentiality overcame Mendoza's will.  The court framed the issue as falling under *Miranda* rather than due process.  The core point of whether Mendoza's statements were voluntary after being promised that his statements were confidential was addressed and rejected by the court.

III.   TRIAL

   A. *Victim's Testimony*

N.C. was 17 years old and in the 12th grade when she testified. N.C.'s mother was married to Mendoza. Mendoza moved in with her when N.C. was six years old.

In the early morning of June 29, 2019, N.C. sent her mother a text message explaining what Mendoza was doing to her. The message read: "When I was in the fourth, fifth grade, Tomas assaulted me for a moment or a little while. During the night. Then other times. I was young and stupid. He sexually assaulted me again. He came to my bedroom around 2:00 or 3:00 in the morning and began touching me there. I started to get away from him. He wouldn't stop. I'm sorry I could not tell you this in person. You know how I am."[6]

N.C. sent the message after Mendoza had entered her room at nearly midnight and locked the door. Mendoza stayed at the end of the bed. N.C. was scared because she felt as though Mendoza "really wanted to do something bad to me." Mendoza started touching N.C. from outside of the blanket and then pushed his hand under the blanket to touch her around the inside of her legs and stomach. N.C. was sleeping in her jeans to prevent Mendoza from touching her. Mendoza began touching the outside of N.C.'s vagina.

Mendoza began rubbing N.C.'s vagina over her pants before trying to undo a belt. He tried to push his hand inside of N.C.'s pants but could not. N.C. tried to move Mendoza's hand away from her but that did not stop him. N.C. estimated this touching lasted for minutes. N.C. thought that Mendoza stopped because he realized she was moving around too much to be asleep. Mendoza left N.C.'s room quietly like nothing

---

[6]   N.C.'s mother, C.B., who was devastated by the message, made a report to law enforcement about a week later. N.C. was 14 years old when she reported Mendoza's conduct.

happened.  N.C. first texted a friend around 2:00 or 3:00 a.m.  N.C. texted her mother about an hour later.

The first time Mendoza touched N.C. she was eight or nine years old, having a sleepover in their living room.  This was what N.C. was referring to in her text message when she mentioned the fourth grade.  N.C. was on the couch watching a movie when she heard Mendoza coming home from the outside.  She thought she would get in trouble for being up late so she pretended to be asleep under her blankets.  Mendoza came from behind N.C., placed his hands inside her blanket, then inside her pants, and began touching inside her vagina.[7]  Mendoza was pushing his fingers everywhere and it really hurt.  N.C. felt terrified and knew what Mendoza was doing was wrong.

The next time Mendoza touched N.C. was after she and Mendoza got snow cones together.  N.C.'s mother was not with them.  N.C. was eight or nine years old.  They were in a red truck with two chairs and a divider.  While N.C. was holding her drink, Mendoza parked the truck and pulled on her shorts with his hand.  He was touching N.C. on top of her leg.  She asked him what he was doing.  N.C. asked Mendoza to stop and told him it was not right.  Mendoza said nothing and kept touching her.

Mendoza could not get inside N.C.'s shorts so he put his hand or finger over her stomach and into the zipper to undo her shorts.  Mendoza touched N.C. inside her vagina under her underwear.  N.C. was scared because she was alone with Mendoza and they were parked in the fields.  N.C. remained quiet about these incidents because she did not believe anyone would believe her.

When N.C. turned 10 or 11, every month or so Mendoza would shine a flashlight in N.C.'s face to see if she was asleep or pretending to be asleep.  These incidents

---

[7]  N.C. said she was on the floor, not the couch, when Mendoza came up behind her. On cross-examination N.C. said she was on the floor, she was alone at the sleepover, she did not remember the time of year, and she did not remember the time of her encounter with Mendoza or what movie she was watching.

increased as N.C. got older. Mendoza could not always touch N.C. She estimated Mendoza was able to touch her "over ten times." Mendoza would try to touch N.C. over her clothes. He would also try to touch her legs, stomach, and vaginal area. Mendoza would also touch N.C.'s chest and tell her to sit on his lap. When Mendoza touched N.C.'s chest, he would put his hand under her shirt.

N.C. did not want Mendoza to hug her because she did not want him to touch her. She felt scared. N.C. stated that she was telling the truth. On cross–examination, N.C. said she was afraid to tell her mother or older brother about Mendoza's first lewd act on her because she did not think anyone would believe someone who was only eight or nine years old. N.C. was also afraid to tell the police what happened.

The next time Mendoza touched her was some months later, N.C. could not recall how many months passed between the incidents, but she thought it may have been summertime because they were getting snow cones. When Mendoza came home from work, he would often ask N.C. to give him a massage. If N.C. tried to rub Mendoza's back, he would put his hand on her leg and "go up from there to try to touch" her vagina. This occurred every one or two weeks or whenever he was tired.

Whenever Mendoza was with N.C. at the beach, the lake, or someone's pool, he would try to play with her in the water, touching N.C.'s vagina. Mendoza would claim it was an accident. This occurred every few months. When N.C. was in middle school, she wore all black and shaved her head. N.C. was told to see a counselor. N.C. never told her counselor about Mendoza's conduct. N.C. attributed her emotional struggles to Mendoza.

B. *Deputy Garza's Testimony*

Deputy Phillip Garza of the Kern County Sheriff's Office began his investigation on July 5, 2019. Garza received the text message N.C. sent to her mother on June 29, 2019. Garza and Mendoza began a nearly two-hour recorded conversation just after 5:00 p.m. on August 1, 2019, at the substation. Garza chose his office for his interview of

Mendoza rather than the interview room because it was hot and uncomfortable in that room and his office was cool and more comfortable. The support staff were headed out for the day.

The recording of the interview in Spanish was played for the jury. The jurors were also given a written transcript in two columns with Spanish on one side and an English translation on the other. The jurors were allowed to keep copies of the transcripts.

Toward the end of the interview, Garza asked Mendoza to write a letter of apology in Spanish. Garza was certified by the sheriff's office as a Spanish speaking deputy. Mendoza's letter, or note, was admitted into evidence, including a translation into English. The letter was read to the jury. Garza walked out of the office while Mendoza wrote the letter, waiting in the squad room. Garza did not want Mendoza to feel uncomfortable by being in the room. Mendoza spent about eight minutes composing the letter.

The letter stopped at the third to the bottom line and was signed and dated. After reading Mendoza's letter, Garza asked him if he was done and if there was anything else he wanted to add. They had a conversation. Garza asked if there was something specific he wanted to add to the letter because if Garza wrote an apology letter he would be specific, although he told Mendoza he did not have to. Garza left his office.

When asked why it was important as a detective for Mendoza to be more specific in his letter, Garza said if he was more specific, it "would be evidence toward an admission." Garza also felt that when people make mistakes in their lives, they want to tell others, "like, taking the rock off my chest." Garza believed it was therapeutic and would benefit Mendoza emotionally and would benefit N.C. if the apology was more than a generic apology. Garza gave Mendoza a few more minutes to add to the letter. Mendoza added "and forgive me for having touched you where I shouldn't have. It was a weakness. Respectively. I hope you understand?"

Garza acknowledged it was an investigative tactic when he told Mendoza things like he was not a suspect, they were just there to document his statement, and that he did not think things were criminal. Garza said he used these tactics to make the person he is interviewing comfortable, "like they could tell me anything." Garza wanted the truth from anyone he talked to. He added that the more secure a person feels, the more apt they are to talk to him and tell him the truth.

On cross-examination, Garza explained that mother reported that her daughter had been touched by Mendoza. Garza interviewed N.C. in his patrol car in a parking lot where she was living. After questioning N.C., Garza said he did not formulate ideas about whether it actually happened and had not yet made a decision to arrest Mendoza.

Garza had N.C. make three pretext phone calls to Mendoza. Garza listened to the first two calls and heard no incriminating statements by Mendoza. Another deputy listened to the third phone call. This time too, Garza decided not to arrest Mendoza. Garza, however, found N.C. willing to share what happened to her and thought she "appeared to be telling the truth." It took a month for Garza to talk to Mendoza because he had many investigations under way. Garza also explained that N.C, was not living with Mendoza when she made the report. Anytime there is a victim who is separated from a suspect in an investigation, there is no immediate danger. Garza was focusing on cases where the victims were in immediate danger, as well as emergency reports.

Given the allegations that were made, Garza described this case as one with a priority closer to the top. Yet, at that time Garza said he had not formed a decision concerning Mendoza's arrest. Once Garza gets enough information to make an arrest, he does so. Once his investigation in this case was complete, "I immediately made the arrest on that same day."

Garza contacted Mendoza by phone and asked to interview him, which occurred on August 1, 2019, about 5:00 p.m. When Mendoza arrived at the substation, Garza did

not use the interview room because it was an extremely hot day with issues in the air conditioning unit. They used his office which was cool.

When asked what tactics he employed, Garza said he appeared friendly to build rapport with Mendoza. He also used minimization—trying to communicate to Mendoza that the allegations were not as serious as they actually were. Garza wanted Mendoza to feel the allegations were minimal. Garza used ruses to make Mendoza more comfortable and open to communicating and speaking the truth to Garza.

As Garza talked with Mendoza, he did not want Mendoza to have the mindset that he was going to talk about felonious acts. Garza felt that if he could minimize in Mendoza's head the level of crime for which he was being investigated, Mendoza would feel more comfortable talking to Garza about his felonious acts. Garza wanted Mendoza thinking his acts were less than they were "so that he wouldn't have a fear of being arrested and going to jail."

The ruse is a lie, a legal tactic used by law enforcement when interviewing people. The investigator will lie, tell the person being interviewed "something that's not true to make [the person] more comfortable in speaking with me or to make [the person] feel that there's not going to be any consequences if, in fact, [the person does] admit to any wrongdoing." One ruse Garza said he used was to tell Mendoza that everything he told Garza was "going to be confidential." "I told him I wasn't going to tell his wife or tell the judge anything that he tells me."

Another ruse Garza used was to pretend he did not know Spanish that well. Garza also mentioned DNA evidence although there was no DNA evidence in the case. At the conclusion of the interview, Garza placed Mendoza into handcuffs and placed him into another deputy's patrol car. Garza did let Mendoza make some personal phone calls. Garza said Mendoza did not have to write the letter at all. Garza maintained that although he had enough information to make an arrest, at that moment in time he had not

27.

yet decided to arrest Mendoza. Garza conceded that when he asked Mendoza to add more to his note to N.C. that he was "giving him ideas."

C. *Mendoza's Testimony*

Mendoza began living with mother in 2009 when N.C. was four years old. Mendoza denied touching N.C. in either the sleepover or snow cone incidents. Mendoza denied touching N.C. or her private parts while driving or in a swimming pool or lake. Mendoza admitted entering N.C.'s room on June 29, 2019, but only to turn off the television by pulling the cable attached to the game remote from under her because the remote was under her.

Mendoza touched N.C.'s hip when he was placing a blanket back on her. Mendoza denied ever putting his hands beneath N.C.'s blanket or touching her to sexually arouse himself. Mendoza touched N.C.'s chest accidentally when he was trying to hug her. Mendoza explained that the psychologist told him he needed to hug N.C. more. Each time he tried to do so, she became aggressive and fell. He also tried to stop her from falling one time.

Mendoza attempted to hug N.C. another time in the living room. Mendoza tried to kiss N.C. once, but she turned away. Mendoza did not consider N.C. to be a person of sexual interest. Mendoza was not aroused around N.C. and did not have an erection. Mendoza went to the substation to inquire about when he would get to see his children. Mendoza said he did not understand all of the words Garza used during the interview.

Mendoza admitted he told Garza that he twice touched N.C. in a moment of weakness, but said he used those words to assist Garza and not to indicate he had any sexual intent in touching her. Mendoza described Garza as giving him ideas. There were things Garza said that Mendoza was not understanding. When Garza talked about being aroused, that was his idea not Mendoza's idea.

Mendoza denied placing his hand on N.C.'s vagina. Mendoza indicated to Garza where he put his hand, and it was Garza who used the word vagina. During the interview,

28.

Mendoza answered yes to a question about whether he was aroused when he touched N.C. "because we were talking about how that was called, but I was not feeling that."

Mendoza said he wrote a note to N.C., but did not write the last sentence asking her to forgive him for touching her where he should not have, or the statement that it was just weakness. Mendoza did not know who wrote the last sentence of the letter. Mendoza thought his wife was jealous of him because she thought he was cheating with other women. C.B. had already threatened him. Mendoza denied ever abusing N.C. Mendoza asserted his wife and N.C. were lying.

### D. *Document Expert*

Beth Chrisman is a forensic document examiner. In her opinion, the original apology note attributed to Mendoza was written by more than one person. The first eight and a half lines to line nine, as well as the signature, were written by one person. The remaining two and a half lines of the note were written by a different person. Chrisman arrived at this conclusion by examining the letter formation, spacing, and the letter height proportion. There was also a break in the rhythm of the writing. The majority of the letter was written at a slower speed than the lines at the end of the letter. The writing at the end also gets smaller.

### E. *Rebuttal*

Garza testified in rebuttal that he added nothing to or alter Mendoza's apology letter. Doing so would be a crime and could have led to Garza losing his job and going to jail. Garza would not risk his livelihood and did not falsify Mendoza's letter.

## IV.    CONSTITUTIONAL RIGHT AGAINST SELF-INCRIMINATION

The trial court expressly found that because Mendoza was not in custody, *Miranda* warnings were therefore not necessary. We find the deputy's questioning tactics, employed without advising Mendoza of his *Miranda* rights, turned what arguably started as a noncustodial interview into a custodial interrogation. The interrogation became more coercive when Deputy Garza promised Mendoza that anything he said would remain

29.

confidential.  The failure to give *Miranda* warnings coupled with a custodial interrogation violated Mendoza's Fifth and Fourteenth Amendment rights against self–incrimination and to counsel.

### A.  *Standard of Review*

In determining if an interview is an interrogation and if the defendant was in custody, we apply a mixed standard of review.  We review the trial court's factual findings regarding the circumstances of the interrogation for substantial evidence.  We independently determine whether a reasonable person in the defendant's position would have felt free to end the questioning and leave.  (*People v. Moore* (2011) 51 Cal.4th 386, 394–395.)

### B.  *Privilege Against Self–Incrimination*

The Fifth Amendment privilege against self–incrimination is incorporated into the Due Process Clause of the Fourteenth Amendment and thus applies to the states.  (*Rogers v. Richmond* (1961) 365 U.S. 534, 540–541; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1106, overruled on another ground in *People v. Lynch* (2024) 16 Cal.5th 730, 768-769.)  To protect a suspect's Fifth Amendment right against self–incrimination, prior to a "custodial interrogation," *Miranda* requires that law enforcement advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed.  (*Miranda*, *supra*, 384 U.S. at p. 444; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.)

The Fifth Amendment provides that no one shall be compelled in a criminal case to be a witness against himself or herself.  "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339.)

An interrogation is custodial, for purposes of requiring *Miranda* advisements, when the person is taken into custody or is otherwise deprived of his or her freedom in

any significant way. Custody consists of either a formal arrest, or, a restraint of freedom of movement of the degree associated with a formal arrest. All the circumstances of the interrogation are relevant to the inquiry. These include the location, length and form of questioning, the degree to which the investigation was focused on the defendant, and whether any indicia or arrest were present. We deferentially review the trial court's findings. (*People v. Moore*, *supra*, 51 Cal.4th at p. 395.) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape–recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 (*Linton*); *People v. Suarez* (2020) 10 Cal.5th 116, 158.)

It is well settled that a setting is not "custodial" simply because the questioning occurred in the police station house, or because the person questioned was one whom the police suspect. Courts review the totality of the circumstances to make this determination. (*California v. Beheler* (1983) 463 U.S. 1121, 1125; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) Where there is not a formal arrest, the inquiry is whether "under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation." Custody refers to circumstances generally thought to present a serious danger of coercion. (*People v. Caro* (2019) 7 Cal.5th 463, 491 (*Caro*).) The inquiry looks at all objective circumstances. It does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323, *Caro*, *supra*, at p. 492.) Where a formal arrest has not yet occurred, the issue of custody revolves on how a reasonable person in the defendant's position would have understood his or her situation. (*People v. Torres* (2018) 25 Cal.App.5th 162, 172 (*Torres*).)

Relevant factors include the location of questioning, its duration, statements made during the interview, the presence or absence of physical restraints during questioning, and the release of the interviewee at the end of questioning. (*Howes v. Fields* (2012) 565 U.S. 499, 509.) Determining whether an individual's freedom of movement was curtailed

31.

is simply the first step in the analysis. Not all restraints of freedom amount to custody for purposes of *Miranda*. (*Ibid*.) Rather than according talismanic power to freedom–of–movement inquiry, courts instead ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Ibid*.; *Caro*, *supra*, 7 Cal.5th at p. 491.)

The concern in *Miranda* with custodial interrogation was with " 'inherently compelling pressures,' " specifically the "psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he [or she] would not otherwise do so freely.' " (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103.) *Miranda* focused heavily on the psychologically coercive nature of police questioning, discussing at length the interrogation tactics outlined in police manuals.

C. *Miranda's Focus on Psychological Coercion*

*Miranda* found that one of the main contributing factors to a psychologically coercive environment is privacy because police are instructed that interviews should take place in the investigator's office or a room of the officer's own choosing. (*Miranda*, *supra*, 384 U.S. at p. 448–449.) *Miranda* noted that police interrogation manuals highlighted isolation and unfamiliar surroundings instructing investigators to: (1) "display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details;" (2) positing the guilt of the suspect "as a fact;" (3) directing his or her comments "toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he [or she] did it;" (4) suggest "perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women;" (5) "minimize the moral seriousness of the offense, to cast blame on the victim or on society." "These tactics are designed to put the subject in a psychological state where his [or her] story is but an elaboration of what the police purport to know already—that he [or she] is guilty.

Explanations to the contrary are dismissed and discouraged." (*Miranda*, *supra*, 384 U.S. at p. 450.)

Miranda discussed other tactics including creating "an oppressive atmosphere of dogged persistence," as well as offering legal excuses for the subject's actions to obtain an admission. (*Miranda*, *supra*, 384 U.S. at p. 451.) *Miranda* also reviewed techniques such as a friendly and unfriendly two–investigator interrogation and the use of trickery. (*Id*. at pp. 452–453.) Another is to point out the incriminating significance of the subject's refusal to talk. (*Id*. at pp. 453–454.)

## D. *Consensual Conversations and Custodial Interrogations*

Although an interaction may begin as a voluntary encounter, the nature of the questioning can turn it into a custodial interrogation. (*Torres*, *supra*, 25 Cal.App.5th 162, 180; *People v. Saldana* (2018) 19 Cal.App.5th 432, 460 (*Saldana*).) An interview is an interrogation when the police use words or actions they " 'should know are reasonably likely to elicit an incriminating response from the suspect.' " (*Torres*, *supra*, 25 Cal.App.5th at p. 173, citing *Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)

Routine or casual conversation does not, in itself, constitute an interrogation. A *Miranda* interrogation may emerge during routine or casual exchanges if the police ask questions designed to elicit incriminatory admissions. (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 600–602; *People v. Andreasen* (2013) 214 Cal.App.4th 70, 86–88.) In evaluating when *Miranda* requirements should apply during routine or casual exchanges, the relevant factors to consider include the nature of the questions, the context of the questioning, the knowledge and intent of the officer asking the questions, the relationship between the questions and the crime, the administrative need for the questions, and any other indications the questions were designed to elicit incriminating statements. (*Andreasen*, *supra*, at p. 88.)

In *Torres*, *Miranda* advisements were not given. (*Torres*, *supra*, 25 Cal.App.5th at p. 166.) *Torres* found that the police questioning constituted an interrogation and turned

33.

the inquiry into whether the defendant was in custody. (*Id*. at p. 173.) The detectives contacted Torres at his home, wore plain clothes, and their weapons were not visible. The interview lasted only 45 minutes. The detectives in *Torres* did not threaten Torres or raise their voices, the entire encounter taking place in a matter of fact and conversational tone. Torres was not arrested until two weeks after questioning. Torres was told he was not under arrest, was free to leave, and did not have to speak to them. (*Id*. at pp. 173-174.)

The interview in *Torres* took place in an unmarked car with the engine and air conditioning running. Initially, the detectives asked questions without suggesting an answer. The detectives obtained a saliva sample from Torres and said they would be running a DNA test in the trunk of the car to determine if he had touched an alleged molestation victim. They told him they would obtain the results in a few minutes. Detectives asked Torres if he knew why they were questioning him. He replied he thought the victim's mother accused him of grabbing the girl's part. (*Torres*, *supra*, 25 Cal.App.5th at p. 176.)

Then detectives asked Torres how many times he touched the girl's vagina. He asserted he never did so. From this point on, the detectives dominated and controlled the course of the interrogation and used techniques to pressure Torres. These included telling the defendant about false evidence, asking confrontational and accusatory leading questions, giving the defendant choices and encouraging him to pick one of them, and minimizing the accusations against him. The detectives also expressed their belief that Torres was culpable and had the evidence to prove it. (*Torres*, *supra*, 25 Cal.App.5th at p. 176.)

The detectives told Torres the victim claimed the defendant touched her vagina, his DNA could be transferred by touch, and the test in the trunk of the car could prove the defendant's culpability. (*Torres*, *supra*, 25 Cal.App.5th at pp. 176-177.) The detectives also told Torres they knew Torres had committed particular sexual acts on the victim

based on their DNA findings and asked him if he wanted the judge to think he was an honest man who made mistakes, or an animal. (*Id.* at p. 177.)

*Torres* found that notwithstanding their assurances that Torres was not under arrest, free to leave, and did not have to talk to them, the tactics used by the detectives created a custodial interrogation. This was so even though the detectives were professional and courteous. Although the detectives told Torres to tell the truth, using the DNA ruse, and other ruses, would lead a reasonable person in the defendant's situation to believe that he or she was not free to leave until they "stopped lying and confessed to what the detectives could prove scientifically with the DNA test running in the trunk." Torres began to change his story and confessed to touching the victim twice. (*Torres*, *supra*, 25 Cal.App.5th at p. 179.) *Torres* concluded that under the totality of the circumstances, a reasonable person would not have felt at liberty to terminate the interrogation and leave, and the interrogation occurred without *Miranda* warnings. (*Id.* at p. 180.)

In *Saldana*, the defendant was Mexican immigrant in his late 50's with a serious criminal history whom two girls accused of molesting them. The police requested he come to the station for questioning, where he was not given *Miranda* advisements and told he was free to leave and not under arrest " 'right now.' " (*Saldana*, *supra*, 19 Cal.App.5th at pp. 436–437.) The police questioned Saldana about 40 minutes using several interrogation techniques. (*Id.* at p. 437.)

The first was manifesting the rock–solid belief that the defendant was guilty and indicating all denials would fail. The second was to provide the defendant with moral justification and face–saving excuses for having committed the act. This tactic has been described as implying leniency in punishment is forthcoming upon confession. The detective told Saldana it looked bad, there was something he was not telling, and something happened. The detective asked what happened, wanted to get to the truth, and

explained that when the victim's clothes came back they would have Saldana's DNA on them.  (*Saldana*, *supra*, 19 Cal.App.5th at p. 437.)

The detective told Saldana that sometimes we make mistakes, maybe something went too far, maybe there was a moment of weakness, and perhaps the girls put themselves there.  Although Saldana initially denied the accusations more than 25 times, he later made incriminatory admissions and was arrested a few minutes after the conclusion of the interview about a block from the station.  (*Saldana, supra,* 19 Cal.App.5th at pp. 437, 461.)

The *Saldana* court described the police questioning used there as indicating to the defendant the detectives' "resolute belief he committed the crime."  When this occurs, the custody inquiry becomes whether a reasonable person in the defendant's circumstances, having been told the police know he or she committed the crime, would feel free to break off the interview and leave.  In light of the detective's repeated rejection of Saldana's denials, a reasonable person in his position would eventually realize that telling the " 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave."  (*Saldana, supra,* 19 Cal.App.5th at p. 458.)  Courts have concluded under similar circumstances, advising the suspect that he or she was not under arrest and free to leave was insufficient to support a conclusion he or she was not in custody for purposes of *Miranda*.  (*Ibid.*; citing *U.S. v. Hashime* (4th Cir. 2013) 734 F.3d 278, 284 [telling the interrogated subject he was free to leave was not talismanic or sufficient in and of itself to show a lack of custody]; *U.S. v. Cavazos* (5th Cir. 2012) 668 F.3d 190, 195 [same].)

The *Saldana* court reviewed the factors discussed in *People v. Aguilera* (1996) 51 Cal.App.4th 1151 (*Aguilera*) to determine whether the interrogation there was custodial. (*Saldana*, *supra*, 19 Cal.App.5th at p. 459.)  In evaluating whether an interrogation is custodial, courts put significant weight on the nature of the questioning.  " '[A]ccusatory questioning is more likely to communicate to a reasonable person in the position of the

suspect, that he [or she] is not free to leave' than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*People v. Aguilera, supra,* at p. 1164; *Saldana*, *supra*, at p. 459.)

*Saldana* described the detective's interview as an interrogation that was "persistent, confrontational, and accusatory." The detective did more than confront Saldana with adverse evidence. He confronted Saldana with unqualified assertions of his guilt, despite Saldana's repeated denials, characterizing Saldana as a molester, a pedophile, or succumbing to a moment of weakness. The detective insisted that he knew something happened. (*Saldana*, *supra*, 19 Cal.App.5th at p. 459.) The detective also suggested Saldana was not being truthful by telling him nothing happened. (*Id*. at pp. 459–460.)

### E. *Analysis*

#### 1. *Facts Supporting Finding That Mendoza Was Not In Custody*

The People argue that this case falls outside the rubric of *Torres* and *Saldana* because the tactics used by investigators there were far more accusatory than Garza's questioning of Mendoza here. The defendant in *Torres* was falsely told the victim had taken a lie detector test, she was telling the truth, and they were testing his DNA in the trunk of their car to prove his culpability. (*Torres*, *supra*, 25 Cal.App.5th at p. 177.) In *Saldana*, the detective insisted the defendant was guilty, despite Saldana's repeated denials, and should identify himself as a pedophile or a molester. (*Saldana*, *supra*, 19 Cal.App.5th at p. 459.) Citing *Saldana*, the People contend that interrogation techniques do not inherently trigger custody under *Miranda*. (*Saldana, supra,* at p. 460.)

There are facts in this record to support the trial court's conclusion that Mendoza was not in custody. Although he was asked by Garza to stop by the sheriff substation, he

came of his own accord.  When Garza was away the first time Mendoza tried to talk to him, Mendoza returned to talk to Garza a second time.  Mendoza was not handcuffed or restrained, he was told more than once that he was not under arrest, and Garza told Mendoza at the beginning of the interview that he was free to leave at any time.  Garza also asked Mendoza to leave the door to his office open.  The office door remained open.  Even after Garza told Mendoza that his statements would remain confidential, Garza told Mendoza he was not handcuffed and did not have to say anything.  Garza worked as a supervisor and there were no questions about his physical or mental health.

The substation itself was part of a building with other county offices.  Garza was the only deputy at the substation.  Mendoza was only questioned by Garza.  As noted and found by the trial court, Garza's general demeanor was polite, not hostile.  Garza began the interview asking Mendoza open–ended questions and reiterated several times throughout the questioning that he only wanted the truth.  There is nothing coercive when investigators tell a subject to tell the truth.  (*Linton*, *supra*, 56 Cal.4th at pp. 1176–1178.)  As in *Torres* and *Saldana*, Deputy Garza used a pleasant, conversational tone of voice and maintained a professional demeanor throughout his interaction with Mendoza.

### 2.  *Facts Indicating Custodial Interrogation*

Although there are differences in the nature of the questioning used in *Torres*, *Saldana*, and this case, as in *Torres* and *Saldana* after the beginning of the interview, Garza's questioning became pointed and focused.  Rather than asking general, open–ended questions, Garza asked specific questions that suggested a particular inculpatory response, or, Garza implied that Mendoza was not telling the whole truth.

Most of the psychologically coercive criteria set forth in *Miranda* that create a custodial interrogation can be found in Garza's questioning of Mendoza.  *Miranda* noted that police interrogation manuals highlighted isolation and unfamiliar surroundings instructing investigators to: (1) "display an air of confidence in the suspect's guilt and

from outward appearance to maintain only an interest in confirming certain details;" (*Miranda*, *supra*, 384 U.S. at p. 450), and (2) positing the guilt of the suspect "as a fact." (*Ibid*.)

Several of Garza's questions fell into these first two categories. Garza noted that it was strange that N.C. would come up with her story out of nothing. Garza confronted Mendoza with N.C.'s allegation that Mendoza had touched her in her room. Garza wanted to know if Mendoza went into N.C.'s room to talk to her, to fix her blanket, or to say goodnight to her. Garza asserted that there was something going on for the allegations to exist and that he did not think N.C. came up with this. Garza reiterated something had happened.

Referring to the allegations occurring when Mendoza purchased icy treats for N.C., Garza asked how Mendoza placed his hands on the steering wheel when he drove. Garza used the example of his grandfather placing his hand on Garza's head, shoulder, or leg. Garza asked if Mendoza drove affectionately with N.C. like that. Mendoza maintained that if he steered with one hand, he was holding water or a soda. Garza rejected Mendoza's account, suggesting accusatorily that Mendoza placed his hand on N.C.'s shoulder, head or leg. Garza later suggested Mendoza placed his hand "there" or on the seat.

Garza said they do investigations and, "men talk with me and they lie to me; No, no, no." But they collect evidence, DNA evidence, biological evidence, other proof. As Garza began a sentence without completing it: "There are many ways to—" Mendoza finished the sentence, "Many ways to pull the truth out."

Trying to generate inculpatory information, Garza told Mendoza: "[N.C.] has told me very different stories, from what you're telling me. But very similar also." Garza said in the end he just wanted the truth, things happen, and he knew people are scared. Garza added, "If you touch a child, you're going to go to jail." Garza added there are

39.

times, "yes," but there are also times "no." Mendoza asked, "how" and Garza explained that every case is different.

Garza also used another technique set forth in *Miranda*: (3) directing his or her comments "toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he [or she] did it;" (*Miranda*, *supra*, 384 U.S. at p. 450.) Garza placed the spotlight on Mendoza: "About [N.C.], I do think there have been instances where you touch[ed] her. I want to tell you that when a man touches a girl, whether on the skin or the clothing, you leave biologic evidence. You leave DNA evidence." Garza explained, that it gets left on the clothes and those specific parts. Garza wanted Mendoza to tell him the truth, but suggested that Mendoza had "touched [N.C.] on those parts?" Garza added "if it was an accident—."

Garza also explored whether Mendoza acted the way he did because he drank too much alcohol, following this fourth technique identified in *Miranda*: (4) suggest "perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women." (*Miranda*, *supra*, 384 U.S. at p. 450.)

Garza confronted Mendoza directly with N.C.'s allegations, initially saying he had spoken with her, and N.C. told "me a lot of things." Mendoza said he did not understand why she was saying so many things. Garza replied: "And a lot of those things happen." He then asked Mendoza if he drank. When Mendoza said one to three beers, Garza suggested he perhaps drank six or 12.

Garza asked about Mendoza's intent, and if he was not drunk, was he in depression, or did he think it was his other daughter? Mendoza denied these accusations. Garza looked for a word in Spanish, suggesting Mendoza was in heat.

Garza also used this fifth technique discussed in *Miranda* in questioning Mendoza: (5) "minimize the moral seriousness of the offense, to cast blame on the victim or on society." "These tactics are designed to put the subject in a psychological state where his [or her] story is but an elaboration of what the police purport to know already—that he

[or she] is guilty. Explanations to the contrary are dismissed and discouraged." (*Miranda*, *supra*, 384 U.S. at p. 450.) Although Garza sometimes minimalized Mendoza's culpability, he would a moment later act assuredly that Mendoza was guilty and posit Mendoza's guilt as a fact.

Garza thanked Mendoza for telling him the truth, adding, "You're not going to jail yet." Garza said that sometimes a man has good intentions when touching a child and the child misinterprets it. Garza used the example of going into a girl's room, covering her with a blanket, and the man touches a part he should not have touched because the girl moved as not being at fault because the man's intentions were not bad and accidents happen.

Then, Garza seemed to exonerate Mendoza telling him he was speaking to him differently "from the other suspects" because he knew what things had happened, but did not think they were criminal. After minimalizing Mendoza's culpability, Garza turned back to assuredness that he committed the crime, asking: "What has happened. Where have you touched her? Why? What were the circumstances your hand was near her part. Just to … document it."

Mendoza explained there was an instance when he pulled a game controller out from under N.C. and he may have "put his hand there." This happened quickly and N.C. woke up. Mendoza insisted he loved N.C. the same way as his own children.

After a long discussion about adolescent hormones, Garza said he wanted the truth and "I also want you not to be afraid." Mendoza said he was worried because "it's not a small little problem." Garza explained that sometimes a man touches a woman and it is not criminal, adding it could be "in the wrong places." Garza suggested things happen between a man and a woman that are not criminal. Garza used the example of checking his child's diaper rash. Because you are helping the child, the intentions do not make the act criminal.

41.

Trying to cast culpability toward the victim in the same fashion as the fifth interrogation technique identified in *Miranda*, Garza told Mendoza that N.C. "tells me that sometimes she lets you touch her. She lets you." Garza asked Mendoza to hear him out: "That it's her fault. And when that happens, then an adult, like a man—she looks almost like an adult." They both agreed N.C. was "well formed." To minimize Mendoza's culpability, Garza told Mendoza that sometimes a man is going to falter and suggested perhaps what happened was consensual. Mendoza replied, "But not with a girl, man."

*Miranda* discussed other common interrogation tactics including creating "an oppressive atmosphere of dogged persistence," as well as offering legal excuses for the subject's actions to obtain an admission. (*Miranda*, *supra*, 384 U.S. at p. 451.) There is no doubt from reading Garza's interview of Mendoza that Garza created such an atmosphere, which included legal excuses for Mendoza's actions. Combined with the ruses he employed throughout his questioning, our objective reading of the transcript shows Garza was clearly seeking a confession. Garza refused to accept Mendoza's prior denials that anything happened, he stated and implied that Mendoza had improperly touched N.C., and suggested Mendoza's physical DNA evidence would be found on N.C.'s person and her clothing.

Mendoza maintained he never "want[ed] to touch [N.C.]," but only while hugging her and once catching her when she was falling. During the falling incident, Mendoza touched N.C.'s vagina quickly during the fall, describing what occurred as an incidental and unintentional touching.

Garza held up the Penal Code and told Mendoza that whether Mendoza committed a crime or not depended on what the code said. Further Garza strongly implied that he would decide whether Mendoza was culpable telling Mendoza that he thought things had happened, not illegal things, but that he needed the truth after repeatedly rejecting Mendoza's many denials of wrongdoing.

42.

Garza then made his first promise that anything Mendoza said would remain confidential. Garza elaborated on his initial promise that their conversation would remain confidential with these promises: "I'm not going to tell your wife. I'm not going to tell some lady out there; the judge, nobody. It just stays with you and me." This tactic was more than what the People refer to as a ruse or a trick. It was designed to break down Mendoza's resistance to saying anything incriminatory about himself, or, to request the assistance of counsel.

Garza next told Mendoza that he was not handcuffed and did not have to say anything. Objectively viewed, the power of Garza's promise not to tell anyone, including a judge, undermined Garza's statement a moment later that Mendoza did not have to say anything. Further undermining the comment that he did not have to say anything was Garza's demand immediately thereafter that Mendoza tell him the truth along with a reminder that there was DNA evidence. Garza told Mendoza he needed the truth to make the best and preferable conclusions and he would not think well of Mendoza if Mendoza said things contrary to the evidence. Rather than recommending silence, these subsequent comments accomplished the opposite; nullifying the comment that Mendoza did not have to say anything by encouraging and enticing Mendoza to speak further.

The DNA ruse used in *Torres* was far more elaborate than the deputy's reference to using such evidence here. The investigators in *Torres* told the defendant they would not leave, and Torres would not go home until he stopped lying and confessed. (*Torres*, *supra*, 25 Cal.App.5th at pp. 179–180.) Although Deputy Garza did not go that far in his rejections of Mendoza's assertions, he consistently refused to accept Mendoza's account. Garza's ruse that he would retrieve DNA evidence indicated to Mendoza that Garza was sure of Mendoza's culpability.

Garza's questioning remained persistent, confrontational, and accusatory throughout the interview. Not long after questioning began, Garza told Mendoza it was strange the victim would come up with a story out of nothing; Garza confronted Mendoza

43.

with the victim's allegation Mendoza touched her in her bedroom; and there was something going on for there to be allegations and Garza did not think the victim came up with the allegations.

Garza dismissed Mendoza's consistent denials of any wrongdoing or sexual intent, as did the investigators in *Torres* and *Saldana*. Although he did not blatantly accuse Mendoza of being a child molester as occurred in *Saldana*, Garza suggested and implied something illegally sexual had happened and wanted more from Mendoza than denials. Garza's initial exhortation to tell the truth at the beginning of the interview became linked to directed questions suggesting guilt, or criminal conduct, that were designed to lead to a confession.

The tactic of telling a subject he or she is not a suspect, or that the officer does not believe they have done anything criminal, is a tactic discussed in *Miranda* and its progeny that minimalize the culpability of a suspect's conduct to illicit incriminatory statements. These and most of the other interrogation techniques discussed in *Miranda* were used by the deputy here. As in both the *Saldana* and *Torres* cases Garza continually confronted Mendoza as though he was guilty, adding more of N.C.'s allegations to his questions as the questioning proceeded. Like *Saldana* and *Torres*, Garza's questioning of Mendoza was not general, simple, or unconfrontational.

The general tenor of Garza's questions was very similar to the questioning tactics and ruses used in *Saldana*. In finding the situation custodial, *Saldana* found that the detective's "insistence that Saldana was guilty, his disbelief of Saldana's many denials, and his use of classic interrogation techniques reflects the sort of police–dominated atmosphere that *Miranda* warnings were intended to counteract. This included the two–prong interrogation technique. First, using tactics suggesting the defendant should confess because no other course of action was plausible; confronting the defendant with real or invented evidence and refusing to credit his denials. (*Saldana*, *supra*, 19 Cal.App.5th at p. 460; *Torres*, *supra*, 25 Cal.App.5th at p. 178.)

Second, employing tactics suggesting the defendant would in some way feel better or benefit if he confessed, including appealing to less morally culpable reasons for committing the offense. (*Saldana*, *supra*, 19 Cal.App.5th at p. 460; *Torres*, *supra*, 25 Cal.App.5th at p. 178.) This second feature of Garza's questioning was particularly relevant to his request that Mendoza not only write an apology letter to the victim, but that he elaborate his original statement.

"Over and over again," the detective in *Saldana* "conveyed the message that Saldana had no meaningful choice but to admit some version of the crime because continued denials—in light of the extensive and irrefutable evidence against him—was simply futile. Insisting on the 'truth' until Saldana told him what he sought, the objective message conveyed was that Saldana would be interrogated until he admitted touching the girls." (*Saldana, supra,* 19 Cal.App.5th at p. 460) Although the detective maintained a professional demeanor throughout, using a pleasant and conversational tone of voice did not negate the inherently coercive nature of the interrogation in the absence of *Miranda* warnings. (*Saldana*, *supra*, at p. 460.)

Garza was more subtle than the investigators in *Torres* and *Saldana* in how he implied Mendoza was lying, usually avoiding direct accusations. Garza expressly stated he believed something happened, strongly implying Garza thought Mendoza was lying. Garza rejected Mendoza's claims of innocence, leaving only one implication—that Mendoza was guilty of the allegations. Garza confronted him with N.C.'s accusations, saying or implying that Mendoza was not telling the whole story.

As *Miranda* explained, one concern in custodial interrogations is the privacy the defendant was subjected to. (*Torres*, *supra*, 25 Cal.App.5th at p. 176.) Although the substation was not filled with armed deputies and the door to Garza's office remained open, the location was isolated and Mendoza was alone with his interrogator in the deputy's choice of settings—his own office.

45.

As occurred in *Saldana* and *Torres*, Garza was the only suspect of criminal wrongdoing and was aware he was accused of molesting his stepdaughter. At the end of Garza's questioning, Mendoza asked Garza if he could leave, seeking Garza's permission rather than trying to leave Garza's office. Mendoza was arrested at the conclusion of the interrogation. Despite being told he was not under arrest and was free to leave at the beginning of questioning, the circumstances that developed would lead a reasonable person to believe he or she was unable to leave until giving the investigator the confession being sought. A reasonable person in Mendoza's situation would have felt that they were in custody even before Garza made the promise of confidentiality.

Although there were some differences, on balance Garza's questioning of Mendoza was comparable to the interview in *Saldana* where a combination of factors created "the sort of police–dominated atmosphere that *Miranda* warnings were intended to counteract." (*Saldana*, *supra*, 19 Cal.App.5th at p. 460.) Deputy Garza employed varied interrogation techniques specifically highlighted in *Miranda* as being psychologically coercive, along with the factors that Mendoza was alone at the station in the deputy's choice of location for questioning, and Mendoza being the single suspect of the molestation. It is worth noting that in neither *Torres* nor *Saldana* did the investigators promise the defendant that everything he said would be confidential and would not be disclosed to a judge. In this regard, although different, Garza's tactics were at least as psychologically coercive as those used in *Torres* and *Saldana*.

The false promise of confidentiality compounded the circumstances of the questioning. Mendoza argues the false promise of confidentiality created more than a strategic ploy or ruse—it turned *Miranda* on its head. We agree with this assessment of Garza's false promise of confidentiality. Garza never advised Mendoza that he had a right to remain silent or the right to have counsel present during questioning. Rather than advising Mendoza that anything he said could be used against him in a court of law, Garza promised Mendoza's comments would be confidential and that the deputy would

46.

tell no one, including the judge. This false promise of confidentiality was the antithesis of the *Miranda* warnings designed to protect the defendant's rights against self–incrimination and counsel. If we were to find *Miranda* warnings inapplicable to this case, it would be tantamount to overruling or ignoring *Miranda* itself.

By the time Garza made the false promise of confidentiality, what had arguably begun as a voluntary interview of the defendant had already turned into a custodial interrogation devoid of prior *Miranda* warnings. Garza had already indicated his resolute belief that Mendoza committed the crime turning the inquiry into whether a reasonable person in the defendant's position would think he or she was free to break off the interview and leave. (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.) Citing Professor Wayne LaFave in Criminal Procedure treatise, *Saldana* noted that when a suspect has been told he or she "is not under arrest and can leave at any time, but the contemporaneous conduct of the police nullifies that advice, the advice 'will not carry the day.' " (*Ibid*., citing 2 LaFave, et al., Criminal Procedure (4th ed. 2015) § 6.6(d), p. 820, fn. 64.) The false promise of confidentiality compounded the deputy's earlier violations of *Miranda*.

The questions directed to Mendoza throughout the interrogation were of the type designed to illicit incriminatory statements, especially the false promise of confidentiality. Mendoza was never advised of his *Miranda* rights. His rights against self–incrimination and the presence of counsel during questioning were violated. The trial court erred in finding that Mendoza was not in custody, not subjected to an interrogation, and that there was no violation of *Miranda*.[8]

---

[8]     Because the interrogation was recorded, the facts surrounding an admission or confession are undisputed and subject to our independent review. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1177; *People v. Suarez*, *supra*, 10 Cal.5th at p. 158.) Our inquiry looks at all objective circumstances and does not depend "on the subjective views harbored by the interrogating officers or the person being questioned." (*Stansbury v. California*, *supra*, 511 U.S. at p. 323; *People v. Caro*, *supra*, 7 Cal.5th at p. 492.) Because we do not consider the subjective views of the deputy or the defendant,

### 3. *Admissions in Apology Letter*

Garza asked Mendoza to compose the apology letter toward the end of the interrogation. At this stage of the questioning, Mendoza was in custody and his will had been overborne by Garza's false promise of confidentiality. We reject the People's argument that this issue was forfeited or that this issue should somehow be analyzed separately from Mendoza's verbal confession.

Once a defendant has confessed as a result of police coercion, it may be presumed a subsequent confession is the product of the psychological or practical disadvantages of having "let the cat out of the bag by confessing." Subsequent statements of the defendant made soon after the coerced confession must also be suppressed. (*People v. Sims* (1993) 5 Cal.4th 405, 444–445.)

Garza cajoled Mendoza into writing the letter of apology to N.C., suggesting it would make it easier for them to live together as a family again and it would help N.C. feel better. Garza later directed Mendoza to add to the letter to make his apology more specific. Although Garza did not tell Mendoza what to write and even said he did not have to add anything, he clearly expressed to Mendoza that he write a more incriminating statement to N.C., not accepting Mendoza's general and less inculpatory apology.

Although Garza did not dictate or write Mendoza's letter, he pushed Mendoza to elaborate the apology by being more specific. Garza used the example of a spouse whose partner had cheated on them. The spouse would want a specific apology not a general one. Garza was, through his example of the aggrieved spouse, directing Mendoza to be more specific even if he did not expressly tell him what to say. Garza also testified that if Mendoza was more specific in his apology, it "would be evidence toward an admission." Although this is a subjective indication of Garza's intent, it is also an objective indication

---

and because the recorded interrogation leaves the facts undisputed, we reject the People's arguments that this case should be remanded for a further hearing before the trial court.

48.

of the coercive environment Garza had created during the custodial interrogation. Although Garza was not an author of the apology letter, he became its chief editor.

The contents of the apology letter were not the product of Mendoza's free will but were the subsequent product causally linked to improper coercion.[9] The apology letter, therefore, was inadmissible and should have been suppressed along with Mendoza's verbal confession.

### 4. *Summary*

The questions directed to Mendoza throughout the interrogation were of the type designed to illicit incriminatory statements, especially the false promise of confidentiality. The deputy's coercion continued as he had Mendoza write the apology letter and cajoled Mendoza into making the apology more incriminatory. Mendoza was never advised of his *Miranda* rights. His rights against self–incrimination and the presence of counsel during questioning were violated. The trial court erred in finding that Mendoza was not in custody, not subjected to an interrogation, and that there was no violation of *Miranda*.[10]

---

[9]    Although the *Sims* court recognized the presumption is rebuttable, the People bear the burden of establishing that there was a break in the chain of causation between the first and subsequent confessions. (*Sims*, *supra*, 5 Cal.4th at p. 445.) The record of the interrogation shows no such break in the causal link between Mendoza's verbal confession and his apology letter.

[10]    Because we find that Mendoza's *Miranda* rights were violated, we do not reach the other issues briefed by the parties. These included whether Mendoza's statements were made voluntarily, whether defense counsel was ineffective for failing to object to the admission of Mendoza's statements as being involuntary, and whether the record on appeal is adequate for appellate review—which is a question related to whether the defendant's confession was voluntary, an issue we need not reach in light of our finding that *Miranda* was violated.

The recorded interrogation provides a complete record for review of whether *Miranda* was violated. The inquiry into whether a defendant is in custody looks at all objective circumstances. It does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California*, *supra,* 511 U.S. at p. 323, *Caro, supra,* 7 Cal.5th at p. 492.) "The facts surrounding an

## V. PREJUDICE

We turn to whether the error in admitting Mendoza's inculpatory statements and his apology letter was harmless error. The test in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) is generally applicable to error under the United States Constitution, including the erroneous admission of involuntary statements. (*People v. Neal* (2003) 31 Cal.4th 63, 86, citing *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 (*Fulminante*).)

"The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard (*Chapman*[, *supra*,] 386 U.S. at p. 24)." (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029 (*Henderson*).) The People bear the burden " 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statement[] not been admitted.' " (*Id*. at p. 1029.) "Because confessions ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt …, the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless–error standard.' " (*Ibid*.)

---

admission or confession are undisputed to the extent the interview is tape–recorded, making the issue subject to our independent review." (*People v. Linton, supra,* 56 Cal.4th at p. 1177; *People v. Suarez*, *supra,* 10 Cal.5th at p. 158.)

There are no admissions that were made outside the recorded statements. (See *People v. Ray* (1996) 13 Cal.4th 313, 339–340.) The single contested fact at the suppression hearing and at trial was whether a second statement in Mendoza's apology letter was written by Mendoza or by someone else. No other fact of the interrogation was disputed. Therefore, there is no need to remand the case for a further hearing to gather additional evidence, as posited by the People. The trial court fully considered the issues relevant to *Miranda*. As just noted, where, as here, the interview is recorded the recorded proceeding serves as a complete record. Furthermore, subjective evidence is irrelevant to the issue of whether *Miranda* was violated.

*Henderson* enumerated several examples of circumstances which could render an erroneous admission of a confession harmless: " '(1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime ….' " (*Henderson*, *supra*, 9 Cal.5th at p. 1030.) The list is not intended to be exhaustive but illustrative of the kind of strong evidence required to satisfy the *Chapman* standard. (*Henderson*, *supra*, at p. 1030.)

Mendoza's confession was likely a significant factor in his conviction. None of the examples of what could constitute harmless error noted in *Henderson* apply here. There were no independent witnesses. (See *Saldana*, *supra*, 19 Cal.App.5th at p. 463.) Mendoza was not apprehended committing the crime and there was no video evidence to corroborate the victim's testimony.[11] (*Henderson*, *supra*, 9 Cal.5th at p. 1030.)

The People, however, relied heavily on Mendoza's confession and his apology letter in their initial closing argument and again in their rebuttal argument. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " (*Arizona v. Fulminante*, *supra*, 499 U.S. at p. 296.) " 'The confession operates as a kind of evidentiary bombshell which shatters the defense.' " (*People v. Cahill* (1993) 5 Cal.4th 478, 503.) On this record, Mendoza's statements to Garza were crucial to the

---

[11] We do not imply that the victim's testimony lacked credibility. Jury deliberations began on September 12, 2022, shortly before noon, and concluded on September 13, 2022, just after 11:30 a.m. The jury requested to hear a portion of N.C.'s testimony again. Deliberations apparently took place over the afternoon of September 12 and continued the following morning. To the extent jurors may have harbored doubts about N.C.'s credibility or any part of her testimony, these would likely have been put to rest with Mendoza's confession and apology letter as a prominent part of the People's evidence.

51.

prosecution.  (*Torres*, *supra*, 25 Cal.App.5th at p. 182, citing *People v. Cahill*, *supra*, 5 Cal.4th at p. 497.)

Where, as here, constitutional error has occurred, the People bear the burden to demonstrate that the error was harmless beyond a reasonable doubt.  Under *Chapman*, it is not enough that " 'in a trial that occurred without the error, a guilty verdict would surely have been rendered.' "  We instead must ask " 'whether the guilty verdict actually rendered in this trial was surely unattributable to the error.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)  We cannot answer this question affirmatively here.  The admission of Mendoza's statements, including his apology letter, was not harmless beyond a reasonable doubt.  The trial court erred in admitting this evidence for the jury's consideration.  The admission of Mendoza's incriminating statements and his apology letter was prejudicial.

## DISPOSITION

The trial court erred in allowing the defendant's statements to the deputy and written letter to the victim into evidence in violation of his *Miranda* rights.  The judgment is reversed, and the case remanded for a new trial.

FRANSON, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.